UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANTHONY MINES, individually and on behalf of others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 1:17-cv-04746-RLY-DLP |
| GALAXY INTERNATIONAL PURCHASING, LLC, a Nevada limited liability company, GLOBAL CREDIT & COLLECTION CORP., a Delaware corporation, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

### REPORT AND RECOMMENDATION

This matter comes before the Court on Defendants' Motion to Compel Arbitration (Dkt. 26). The matter has been referred to the Undersigned for a report and recommendation.

## I.    Introduction

In December 2017, Plaintiff, Anthony Mines ("Mr. Mines"), individually and on behalf of others similarly situated, filed a Class Action Complaint against the Defendants, Global Credit & Collection Corporation ("Global") and Galaxy International Purchasing, LLC ("Galaxy"), alleging that they failed to identify the current creditor of his debt and the putative class members' debts in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.* [Dkt. 1 at 4.]

On April 5, 2018, the Defendants filed the present motion to compel arbitration and stay this action pending arbitration. [Dkt. 26.] Plaintiff opposes

1

Defendants' motion to compel on three grounds: 1) the Defendants have not provided sufficient evidence to show that any contract to which Mr. Mines was a party permitted the right to force binding arbitration to be assigned; 2) even if there is an arbitration provision, it does not apply to his FDCPA claim; and 3) any right to arbitration was discharged through Mr. Mines's[1] bankruptcy proceedings. [Dkt. 41 at 1-2]. The Undersigned will address each in turn.

## II.    Background

### A.  Credit Agreement Documents

Mr. Mines applied online for a Milestone Gold MasterCard credit card through Mid-America Bank & Trust Company on May 12, 2015. [Dkt. 29 at 10.] Upon pre-qualification, Mr. Mines was shown Mid-America's Terms and Conditions (the "Terms and Conditions") that contains an arbitration provision that states:

> **Applicability of Arbitration Disputes Provision.** The Arbitration of Disputes Provision set forth in this document and the Cardholder Agreement does not apply to Covered Borrowers.
>
> **ARBITRATION OF DISPUTES PROVISION PLEASE READ THIS ARBITRATION OF DISPUTES PROVISION CAREFULLY. UNLESS YOU SEND US THE REJECTION NOTICE DESCRIBED BELOW, THIS PROVISION WILL APPLY TO YOUR ACCOUNT, AND MOST DISPUTES BETWEEN YOU AND US WILL BE SUBJECT TO INDIVIDUAL ARBITRATION. THIS MEANS THAT: (1) NEITHER A COURT NOR A JURY WILL RESOLVE ANY SUCH DISPUTE; (2) YOU WILL NOT BE ABLE TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING; (3) LESS INFORMATION WILL BE**

---

[1] The Magistrate Judge has elected to follow The Chicago Manual of Style's rule on possessives of proper nouns. Chicago Manual of Style 7.17 (17th ed. 2017).

**AVAILABLE; AND (4) APPEAL RIGHTS WILL BE LIMITED.**

[Dkt. 29 at 62.] The Terms and Conditions also state:

> **Arbitration of Disputes.** The Cardholder Agreement, which we will send to you if approved, provides that you and we will resolve claims on your Account by binding arbitration as opposed to in court with a judge or jury. You may opt out of this arbitration provision within 60 days after the opening date of your Account. Your Cardholder Agreement will explain how you may do so. Your Cardholder Agreement terms will also provide that you waive the right to pursue class actions against us.

[*Id.* at 63.] Mr. Mines checked the box in the application portal, thereby acknowledging that he had reviewed these terms and agreed to them. [*Id.* at 13.]

On May 14, 2015, Mid-America opened Mr. Mines's Account (the "Account"). [Dkt. 29 at 2.] The Account had a credit limit of $300 and an annual fee of $75. [*Id.* at 12, 102.] Defendants claim that Mid-America mailed Mr. Mines the Cardholder Agreement in May 2015. [*Id.* at 5.]

The Cardholder Agreement provides that it is binding from "the earlier of (i) the date you sign or otherwise submit an Application that is approved by us, or (ii) the first date that we extend credit to you on your Account, as evidenced by a signed sales slip or memorandum, a Cash Advance transaction, or otherwise." [*Id.* at 6.] It also includes the following arbitration provision:

> **Arbitration of Disputes Provision**
>
> **PLEASE READ THIS ARBITRATION OF DISPUTES PROVISION CAREFULLY. UNLESS YOU SEND US THE REJECTION NOTICE DESCRIBED BELOW, THIS PROVISION WILL APPLY TO YOUR ACCOUNT, AND MOST DISPUTES BETWEEN YOU**

3

**AND US WILL BE SUBJECT TO INDIVIDUAL ARBITRATION. THIS MEANS THAT: (1) NEITHER A COURT NOR A JURY WILL RESOLVE ANY SUCH DISPUTE; (2) YOU WILL NOT BE ABLE TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING; (3) LESS INFORMATION WILL BE AVAILABLE; AND (4) APPEAL RIGHTS WILL BE LIMITED.**

**This provision replaces any existing arbitration provision with us and will stay in force no matter what happens to your Account, including the closing of your Account.**

**Except as expressly provided below, you and we must arbitrate individually, by binding arbitration under the Federal Arbitration Act ("FAA"), any dispute or claim between you, any joint cardholder and/or Authorized User, on the one hand, and us, our affiliates and agents, on the other hand, if the dispute claim arises out of or is related to (a) this Agreement (including without limitation, any dispute over validity of this Agreement to arbitrate disputes or of this entire Agreement), or (b) your Account, or ( c ) any relationship resulting from this Agreement, or (d) any insurance or other service related to your Account, or (e) any other agreement related to your Account (including prior agreements) or any such service, or (f) breach of this Agreement or any such agreement, whether based on statute, contract, tort or any other legal theory (any "Claim"). However, we will not require you to arbitrate: (1) any individual Claims in small claims court or your state's equivalent court, so long as it remains an individual case in that court; or (2) any Claim by us that only involves our efforts to collect money you owe us. However, if you respond to a collection lawsuit by claiming that we engaged in wrongdoing, we may require you to arbitrate.**

. . . .

Judgment on the arbitration award may be entered in any court having jurisdiction. Any dispute regarding whether a

particular controversy is subject to arbitration will be decided by the arbitrator(s). If any part of the damages or relief requested is not expressly stated as a dollar amount, the controversy will be a Claim that is subject to arbitration. You and we acknowledge and agree that the transactions contemplated by this Agreement, and any controversy that may arise under or relate to this Agreement, your Account, or the services or other agreements described above, involve "commerce" as that term is defined and used in the FAA.

If you or we elect to arbitrate a claim, the electing party must notify the other party in writing. The notice can be given after the beginning of a lawsuit and can be given in papers filed in the lawsuit. Otherwise, your notice must be send to Bankcard Services, Attn: Arbitration Demand, P.O. Box 4477, Beaverton, Oregon 97076-4477, and our notice must be sent to the most recent address for you in our files. The arbitration will be administered by the American Arbitration Association (the "AAA") under its rules in effect at the time an arbitration is commenced that are applicable to the resolution of consumer disputes (the "Arbitration Rules"). We will tell you how to contact the AAA and how to get a copy of the Arbitration Rules without cost if you ask us in writing to do so. The Arbitration Rules permit you to request deferral or reduction of the administrative fees of arbitration if paying them would cause you a hardship. In addition, if you ask us in writing, we will consider your request to pay any or all or your costs of arbitration.

. . . .

If any provision of this Section regarding arbitration of disputes shall be deemed to be unenforceable, the remainder of this Section shall be given full force and effect. However, if the provision precluding class, representative or private attorney general Claims in arbitration is deemed unenforceable, this this entire Arbitration Agreement shall be void and of no force and effect.

You may reject this provision, in which case only a court may be used to resolve any dispute or claim. Rejection will not affect any other aspect of the Cardholder Agreement.

> To reject this Provision, you must sent [sic] us a notice within 60 days after you open your Account or we first provide you with a right to reject this Provision. This notice must include your name, address and Account number and be mailed to Bankcard Services, Attn: Arbitration Provision, P.O. Box 4477, Beaverton, Oregon 97076-4477. This is the only way you can reject this Provision.

[Dkt. 29 at 100.]

The Cardholder Agreement reflected the terms governing Mr. Mines's Account. On May 23, 2015, Mr. Mines maxed-out his credit card with a one-time $225 purchase at a Wal-Mart store. [Dkt. 29 at 102.] After the purchase, Mr. Mines had no remaining available credit. [*Id.* at 102.] Mr. Mines failed to make any payments towards the Account balance and, in December 2015, the Account was "charged off," i.e., closed. [*Id.* at 28, 102–117.]

B. <u>Chain of Ownership</u>

After Mid-America charged off Mr. Mines's Account, it sold the Account to Genesis BankCard Services, Inc. ("Genesis"). [Dkt. 29 at 3.] The sale was made pursuant to Mid-America and Genesis's December 7, 2010 Receivables Sale Agreement (the "Mid-America Sale"). [*Id.* at 3, 22–25.] In section 35 of the Mid-America Sale, Mid-America agreed to "transfer, assign, set-over, and otherwise convey to Genesis, for no fee, all Loan Accounts opened pursuant to the Program that have been charged-off by Bank in accordance with Bank's policies and procedures regarding charge-offs." [*Id.* at 24–25.]

On September 26, 2014, Genesis and Defendant Galaxy entered into a Receivables Sale Agreement. [Dkt. 29 at 3, 27–54.] Pursuant to this sale, Genesis

agreed to "sell, assign and transfer all right, title" and otherwise convey some loan accounts to Galaxy, including Mr. Mines's Account. [*Id.* at 54.] Thereafter, Defendant Galaxy hired Defendant Global to collect the debt owed on Mr. Mines's credit card. [Dkt. 28 at 2.]

On February 28, 2017, Global sent a letter to Mr. Mines attempting to collect the debt. [Dkt. 1-3.] The letter identified the original creditor as Mid-America and the current creditor as Galaxy and stated that Global was "authorized by [its] client to collect the outstanding amount owed to them." [Dkt. 1-3.] Mr. Mines claims that this letter violated Section 1692g(a)(2) of the FDCPA by failing to effectively identify the current creditor of the debt because the letter failed to explain the difference between Mid-America and Galaxy and failed to state the identity of Global's client. [Dkt. 1 at 3.]

C. <u>Mr. Mines's Bankruptcy</u>

On October 27, 2017, Mr. Mines filed for chapter 7 bankruptcy, and on November 9, 2017, he amended Schedule G of his petition. [Dkt. 41-3.] Mr. Mines's amendment sought to put his creditors on notice that he rejected "any and all arbitration provisions in any and all" executory contracts. [*Id.*] On February 13, 2018, Plaintiff's bankruptcy plan was approved, and he received a discharge of his debts. [Dkt. 41-4 at 2.] Notice of this discharge was sent to his creditors, including the Defendants, on February 15, 2018. [*Id.* at 4.]

## III.    Legal Standard

A court must compel arbitration under the Federal Arbitration Act ("FAA") where: (1) a valid agreement to arbitrate exists; (2) the dispute falls within the scope of that agreement; and (3) a party has refused to proceed to arbitration in accordance with the arbitration agreement. *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 466 F.3d 577, 580 (7th Cir. 2006).

Arbitration of a dispute may be compelled only when the Court is "satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (emphasis original). In making this determination, the Court will not rule on the potential merits of the underlying claims. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). "Rather, it will decide whether the dispute, on its face, is covered by the language of the arbitration provision." *St. John Sanitary Dist. v. Town of Schererville*, 621 N.E.2d 1160, 1162 (Ind. Ct. App. 1993) (citing *Nat'l R.R. Passenger Corp. v. Chesapeake & Ohio Ry. Co.*, 551 F.2d 136, 140 (7th Cir. 1977). Whether a valid arbitration agreement exists and whether the parties agreed to arbitrate is a matter of state contract law. *AT & T Techs., Inc.*,  475 U.S. at 648; *Dr. Robert L. Meinders, D.C., Ltd. v. UnitedHealthcare, Inc.*, 800 F.3d 853, 857 (7th Cir. 2015); *Hawkins v. Aid Ass'n for Lutherans*, 338 F.3d 801, 806 (7th Cir. 2003); *R.J. O' Brien & Assocs., Inc. v. Pipkin*, 64 F.3d 257, 260 (7th Cir. 1995).

If the Court finds that the parties have a valid arbitration agreement, it applies the FAA to determine whether the parties' dispute should be arbitrated.

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985);

*MPACT Constr. Group, LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 904 (Ind. 2004) The FAA establishes a strong presumption of arbitrability. *Mitsubishi*, 473 U.S. at 626 (1985). In fact, arbitration must be compelled "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs., Inc.*, 475 U.S. at 650. Every doubt is to be resolved in favor of arbitration and the parties are bound to arbitrate all matters, not explicitly excluded, that reasonably fit within the language used. *AT & T Techs., Inc.*, 475 U.S. at 650; *see S+L+H Societá per Azioni v. Miller-St. Nazianz, Inc.*, 988 F.2d 1518, 1524 (7th Cir. 1993); *Ziegler v. Whale Sec. Co., L.P.*, 786 F. Supp. 739, 741 (N.D. Ind. 1992). Additionally, when the language of the agreement is very broad, the presumption of arbitrability is particularly strong. *AT & T Techs., Inc.*, 475 U.S. at 650. Only the most forceful evidence, such as a provision excluding a particular grievance from arbitration, will allow the party resisting arbitration to overcome this presumption. *Id.*

## IV.    Discussion

### A.    <u>**The Defendants have provided sufficient evidence to show that the Cardholder Agreement to which Mr. Mines was a party permitted the rights of Mid-America to be assigned.**</u>

The Plaintiff argues that the Defendants, as non-signatories, to either the prequalification Terms and Conditions or the Cardholder Agreement, lack authority to compel arbitration of Mr. Mines's FDCPA claim. Before being able to address this argument, however, the Magistrate Judge must first determine whether a valid

9

arbitration agreement exists. *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 466 F.3d at 580.

### i. A valid arbitration agreement exists

Mr. Mines argues that two possible arbitration provisions may apply to his Account, one in the prequalification Terms and Conditions and one in the Cardholder Agreement. [Dkt. 41.] Even though he does not deny that he received the Cardholder Agreement, Mr. Mines suggests that the terms of the Cardholder Agreement are not binding on him because the Defendants have failed to prove that he received the Cardholder Agreement before he used the credit card. [Dkt. 41 at 10.] Mr. Mines also argues that even if the Court finds the Cardholder Agreement valid, the arbitration provision contains no language permitting assignability.[2] [*Id.* at 11.] In response, Defendants assert that both the prequalification Terms and Conditions and the Cardholder Agreement contain valid arbitration provisions and that the Cardholder Agreement governed the relationship between Mr. Mines and Mid-America. Additionally, Defendants claim that Defendant Galaxy can now compel arbitration because it was assigned all the contract rights of Mid-America, and that Defendant Global can compel arbitration through equitable estoppel.

In order to determine whether a valid arbitration agreement exists, a federal court looks to the state law governing the formation of the contract. *Baumann v. Finish Line, Inc.*, 421 Fed. Appx. 632, 634 (7th Cir. 2011). Because it appears that the parties agree regarding the application of Indiana law to Mr. Mines's

---

[2] Mr. Mines makes a similar argument regarding the prequalification Terms and Conditions. [*Id.* at 14.]

arbitration provisions, the Court will apply that law accordingly. [Dkt. 27 at 5; Dkt. 41 at 9.] Under Indiana law, Defendants Galaxy and Global, as the parties seeking to compel arbitration, bear the burden of demonstrating the existence of an enforceable arbitration agreement and that the "disputed matter is the type of claim that the parties agreed to arbitrate." *Daimler Chrysler Corp. v. Franklin*, 814 N.E.2d 281, 284 (Ind. Ct. App. 2004); *Wilson Fertilizer & Grain v. ADM Mill. Co.*, 654 N.E.2d 848, 849 (Ind. Ct. App. 1995). In Indiana, a party cannot be required to submit to arbitration unless the party has agreed to do so. *Homes By Pate, Inc. v. DeHaan*, 713 N.E.2d 303, 306 (Ind. Ct. App. 1999) (citing *Northwestern Mut. Life Ins. Co. v. Stinnett*, 698 N.E.2d 339, 343 (Ind. Ct. App. 1998)).

Under Indiana law, a contract is formed when there is "an offer, acceptance, consideration, and a manifestation of mutual assent." *Troutwine Estates Dev. Co., LLC v. Comsub Design and Eng'g, Inc.*, 854 N.E.2d 890, 897 (Ind. Ct. App. 2006). Assent may be expressed by acts which manifest acceptance. *Nationwide Ins. Co. v. Heck*, 873 N.E.2d 190, 196 n. 1 (Ind. Ct. App. 2007). In Indiana, credit card agreements are contracts, and the issuance and use of the credit card creates a legally binding agreement. *Meyer v. Nat'l City Bank*, 903 N.E.2d 974, 975–76 (Ind. Ct. App. 2009); *Weldon v. Asset Acceptance, LLC*, 896 N.E.2d 1181, 1186–87 (Ind. Ct. App. 2008).

On May 12, 2015, Mr. Mines applied for a Milestone Gold MasterCard credit card offered by Mid America. While completing the application on Mid-America's portal, Mr. Mines was clearly notified in the Terms and Conditions that if his

application was approved, the Cardholder Agreement, which would represent the parties' complete agreement, would be mailed to him and that this Cardholder Agreement would contain a binding arbitration provision. [Dkt. 29 at 5, 13]. Thus, Mr. Mines was put on notice that if he chose to use the credit card, his contract would include an arbitration provision. *See generally Clemins v. GE Money Bank*, No. 11–CV–00210, 2012 WL 5868659 at *2 (E.D. Wis. Nov. 20, 2012). Mr. Mines acknowledged that he understood this by clicking the designated boxes and submitting his application. [Dkt. 29 at 13.][3] On May 14, 2015, after considering Mr. Mines's materials, Mid-America approved his application, opened his account, and issued him a credit card with a $300 credit limit.

In May 2015, Mid-America mailed Mr. Mines the Cardholder Agreement. To support this assertion, the Defendants provide an affidavit from Anmol Madan, a Senior Operations Manager at Genesis, affirming that Mid-America mailed the Cardholder Agreement to Mr. Mines in or around May 2015. [Dkt. 29 at 5.] In his affidavit, Mr. Madan states that he is a custodian of records of debt management for Genesis and is knowledgeable "of the records made and maintained by Genesis and its subsidiaries with respect to credit card debt accounts." [*Id.* at 2.] Mr. Madan further states that the records he reviewed and attached to his affidavit

> are all true and correct business records created and maintained by Genesis, or its predecessors, in the course of

---

[3] In a footnote, Mr. Mines seems to challenge whether checking a box demonstrates assent to its terms. However, this argument is contained to a single footnote and completely undeveloped. Therefore, the argument should be deemed waived. *See Baldwin v. White*, No. 1:17-cv-00823-JMS-DML, 2017 WL 3894957 at * 6 (S.D. Ind. Sep. 6, 2017) ("The Court may not develop arguments for litigants, and undeveloped arguments are waived.") (citing *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005)).

> regularly conducted business activity, and as part of the
> regular practice of Genesis, or its predecessors, to create
> and maintain such records, and also were made at the time
> of the act, transaction, occurrence, or event, or within a
> reasonable time thereafter.

[*Id.* at 4.]

Mr. Madan further attests that after Mr. Mines's credit card application was approved, Mid-America mailed the Cardholder Agreement to Mr. Mines and at no point did the postal service return the Cardholder Agreement as undeliverable. [Dkt. 29 at 5, 8–9.]

The Federal Rules of Evidence require a witness only to testify to a matter in which he or she has personal knowledge. Fed. R. Evid. 602. However, personal knowledge of a company's policies can be established by virtue of a person's position within that company. *See Cox v. CA Holding Inc.*, No. 1:13–cv–01754–JMS–TAB, 2015 WL 631393 at * 10 (S.D. Ind. Feb. 13, 2015) (agreeing with other circuits and holding that "the custodian of records for the company relying upon another company's business records as part of a business transaction can authenticate those records as part of its own business records.").

Thus, this affidavit provides sufficient evidence to demonstrate that Mr. Mines received the Cardholder Agreement. *See* Fed. R. Evid. 902; *Boomer v. AT & T Corp.*, 309 F.3d 404, 415 n. 5 (7th Cir. 2002) ("Where a letter is properly addressed and mailed, there is 'a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed.'") (quoting *Hagner v. United States*, 285 U.S. 427, 430 (1932)).

13

Mr. Mines does not present an argument or any evidence challenging Mr. Madan's affidavit. Instead, relying on *Smither v. Asset Acceptance*, LLC, 919 N.E.2d 1153, 1158 (Ind. Ct. App. 2010), Mr. Mines argues that Defendants have not proven that he received the Cardholder Agreement *before* he used the card, which he argues would render the arbitration clause in that contract invalid. Mr. Mines's reliance on the holding in *Smither*, however, is misplaced. In *Smither,* the petitioner opened a credit card account with a bank, fell behind on his payments, and the bank then sold the debt to the respondent. *Smither*, 919 N.E.2d at 1155–56. The petitioner in *Smither* argued that the respondent had not carried its burden to prove the existence of a contract because it had produced three different agreements. *Id*. at 1156–57 Although the court was troubled by the respondent's failure to produce "conclusive" evidence of the agreement, it ultimately found that one of the agreements was controlling. *Id.* at 1157. At no point in its analysis did the court hold that for a credit card agreement to be effective the party seeking to enforce the agreement must prove the credit card holder received the agreement before use of the card. *Id.*

Rather, the court in *Smither* explained that a written card application or generic terms of agreement do not by themselves establish the existence of a contract; the contract creating indebtedness is only formed when the customer accepts the bank's offer of credit by using the card. *Smither*, 91 N.E.2d at 1158-59 (citing *Portfolio Acquisitions, LLC v. Feltman*, 909 N.E.2d 876, 884 (Ill. App. Ct. 2009)). Standing alone, the issuance of a credit card and accompanying cardholder

14

agreement is a "standing offer" to extend credit that may be revoked at any time. *Smither*, 91 N.E.2d at 1158. The terms of a credit card agreement govern the repayment of the loan if the consumer uses the card, not the determination of when a contract is formed. *Smither*, 91 N.E.2d at 1158. Thus, the Plaintiff's argument that the Defendants must prove that he received the Cardholder Agreement before he used the credit card is unpersuasive.

Contrary to Mr. Mines's argument, it is not the issuance of the Cardholder Agreement that creates the binding contract, but rather Mr. Mines's use of the credit card. Mr. Mines completed an application for a credit card with Mid-America that included a provision stating that "[t]he Cardholder Agreement, which we will send to you if approved, provides that you and we will resolve claims on your Account by binding arbitration." [Dkt. 29 at 63.]  Although this did not create an arbitration agreement, it put Mr. Mines on notice that his contract would include such an agreement. *Clemins*, 2012 WL 5868659 at *2. Subsequently, along with the credit card, Mid-America mailed Mr. Mines the Cardholder Agreement and his credit card. The Cardholder Agreement included a provision requiring Mr. Mines to individually arbitrate disputes related to the credit card. Mr. Mines activated and used his credit card without opting out of arbitration, causing a contract to be formed. Thus, the Undersigned finds that a valid agreement to arbitrate existed between Mr. Mines and Mid-America, and Mr. Mines accepted the terms of the arbitration agreement by his conduct of using the credit card.

### ii. *The Right to Arbitration contained in the Cardholder Agreement was Assigned to Defendant Galaxy*

Having found the Cardholder Agreement to be the governing agreement between Mid-America and Mr. Mines, the Court must now determine if the right to arbitration was extended to any entity other than Mid-America.

Mr. Mines asserts that neither Defendant Galaxy nor Defendant Global has standing to compel arbitration because the Cardholder Agreement does not set forth that the right to compel arbitration is assignable. [Dkt. At 12].  Specifically, the Plaintiff argues that Defendant Galaxy has not shown that it was assigned the right to arbitrate, and Defendant Global lacks standing to compel arbitration because it is not an assignee of any contract.

Defendants respond that they have provided conclusive evidence that the arbitration provision in the Cardholder Agreement was assignable and that it was assigned to Defendant Galaxy. Defendants allege that the principle of equitable estoppel allows Defendant Global to compel arbitration.

As a general rule, contract rights are freely assignable unless the contract explicitly limits the right to assignment. 9 Corbin on Contracts § 49.1 (2018); *See also Kuntz v. EVI, LLC*, 999 N.E.2d 425, 429 n. 5 ("As a general matter, Indiana common law allows for the assignment of contractual rights absent an expression of contrary intent by the parties."); 3 Ind. Law Encyc. Assignments § 4 ("unless the parties have agreed otherwise, contract rights are freely assignable."); 27:2 What interests are assignable—Comment, 7 Mo. Prac., Legal Forms § 27:2 (3d ed.) ("As a

16

general rule, contracts may be freely assigned.").[4] Once a contract has been

assigned, the assignee stands in the shoes of the assignor and may enforce any

rights that the assignor had. *See Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813

(Ind. 2012); *Scottsdale Ins. Co. v. Addison Ins. Co.*, 448 S.W.3d 818, 830 (Mo. 2014).

Here, the Cardholder Agreement provides:

> [Mr. Mines] may not transfer your Account to any other
> person. We may assign your Account or amounts owing
> under your Account to any other person at any time and
> the assignee will take our place under the Agreement with
> respect to all agreements and interests transferred. You
> must pay the assignee and otherwise perform your
> obligations under the assigned agreements and interests.

[Dkt. 29 at 100]. Based on the plain language of the Cardholder Agreement and

Indiana law, the arbitration provision was freely transferred to Mid-America's

assignee.  Mid-America sold Mr. Mines's Account to Genesis on December 7, 2010,

assigning all rights, including the right to arbitration, associated with the Account.

On September 26, 2014, Genesis agreed to "sell, assign and transfer" its rights to

Mr. Mines's Account to Defendant Galaxy.  Accordingly, the Mid-America Sale and

the Genesis Receivable Sales Agreement assigned to Defendant Galaxy any rights

under the Cardholder Agreement, which include the right to arbitrate Mr. Mines's

claims.

---

[4] The Cardholder Agreement states that it is governed by Missouri law. [Dkt. 29 at 101.] However,
neither party directly addresses which state law should apply to the assignability of the Cardholder
Agreement. Rather, they cite to multiple jurisdictions, including Indiana and Missouri. Because
Indiana and Missouri law are substantially similar, the Magistrate Judge will not resolve which
state law applies to the assignability of the Cardholder Agreement.

Therefore, the Undersigned finds that the Cardholder Agreement containing the arbitration provision was properly assigned to Defendant Galaxy. Thus, a valid arbitration agreement exists between Mr. Mines and Defendant Galaxy.

### iii.  The Doctrine of Equitable Estoppel allows Defendant Global to Assert a Right to Compel Arbitration

As to Defendant Global, Mr. Mines maintains that this defendant has failed to provide any legal basis for asserting a right to compel arbitration in this matter. In their brief supporting arbitration, the Defendants maintain that Mr. Mines is unable to avoid arbitration as to Defendant Global under the doctrine of equitable estoppel. Mr. Mines seems to argue that this doctrine does not apply because he has raised a statutory FDPCA claim that bars the application of equitable estoppel. [Dkt. 41 at 14-15.]

Both federal and Indiana law recognize the doctrine of equitable estoppel as a means by which a non-signatory may compel arbitration pursuant to an agreement. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); *German Am. Fin. Advisors & Trust Co. v. Reed*, 969 N.E.2d 621, 628 (Ind. Ct. App. 2012). Neither party invokes the Cardholder Agreement's choice of law clause of Missouri for this argument.[5] Defendants, who raise the issue, cite to Wisconsin and Illinois law in their opening brief and Indiana law in their reply brief, and Mr. Mines relies on

---

[5] For the reasons stated herein, the Undersigned submits that the same result would be reached even if Missouri law applies. Missouri only recognizes equitable estoppel when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the non-signatory and explicitly rejects equitable estoppel when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract. *See Netco, Inc. v. Dunn*, 194 S.W.3d 353, 360–62 (Mo. 2006).

Indiana law in his brief. The parties seem to rely almost wholly upon Indiana and Wisconsin caselaw and cite to authority from other jurisdictions as persuasive authority. Both states have found that equitable estoppel allows a non-signatory to compel arbitration in two different circumstances.

> First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. Second, application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.

*German Am. Fin. Advisors & Trust Co. v. Reed*, 969 N.E.2d 621, 628 (Ind. Ct. App. 2012) (citing *Hughes Masonry Co. v Greater Clark Cty. Sch. Bldg. Corp.*, 659 F.2d 836 (7th Cir. 1981)); *Tickanen v. Harris & Harris, LTD.*, 461 F.Supp. 2d 863 (E.D. Wis. 2006); *but see Baldwin v. White*, No. 1:17-cv-00823-JMS-DML, 2017 WL 3894957 at * 6 (S.D. Ind. Sept. 6, 2017) (questions the persuasive value of the *German American* test, noting that no Indiana state court has cited to the case and that the "Indiana Supreme Court would reject the *German American* majority's approach as inconsistent with the reliance requirement of Indiana's equitable estoppel doctrine.").

Here, Defendants maintain that both applications of equitable estoppel can be used by Defendant Global to compel arbitration. [Dkt. 27 at 14]. Defendants

argue that the first application of equitable estoppel is appropriate here because Mr. Mines, a signatory to the Cardholder Agreement, relies on the Cardholder Agreement to bring this FDCPA claim against Defendant Global. Specifically, the Defendants argue that Mr. Mines's FDCPA claim is based on the Defendants' alleged failure to identify the current creditor of his debt. Thus, Defendants maintain that for Mr. Mines to prove his claim, he must rely on the Cardholder Agreement to identify the proper creditor.

Relying on *Smith v. GC Servs. Ltd. P'ship*, 289 F. Supp. 3d 935 (S.D. Ind. 2018), Mr. Mines argues that this Court has already rejected the argument that a non-signatory debt collector may compel arbitration of a signatory's FDCPA claim. The Undersigned does not agree that *Smith* goes that far.

In *Smith*, the plaintiff opened a bank credit card account that was eventually sent to collections. *Id.* at 937-38. The defendant, a non-signatory debt collector, attempted to collect on behalf of the bank. *Id.* The plaintiff filed a class action against the defendant debt collector, alleging that it had sent her, and others similarly situated, a debt collection letter that violated numerous sections of the FDCPA, including Section 1692g(a)(3), because the letters' validation of debt notice provision "wrongfully informed [the] [p]laintiff that disputes must be in writing when, in fact, an oral dispute is valid." *Id.* at 938. The defendant debt collector sought to compel arbitration pursuant to the doctrine of equitable estoppel.[6] *Id.* at 939. This Court held that the non-signatory defendant could not compel arbitration

---

[6] Though not applicable here, the defendant in *Smith* also attempted to compel arbitration under an agency theory that was rejected by the court.

through equitable estoppel because the plaintiff's FDCPA claim that the defendant's validation notice was defective was not based on the terms of the underlying credit card agreement. *Id.* Relying on *Fox v. Nationwide Credit, Inc.*, No. 09-cv-7111, 2010 WL 3420172 at *6 (N.D. Ill. Aug. 25, 2010),[7] the Court noted that "[p]laintiff's claims are not based on the terms of the Credit Card Agreement" and, therefore, were "not even of a type that could be asserted in defense against a creditor suing on a breach of the cardholder agreement." *Smith*, 289 F. Supp. 3d 939.

Mr. Mines's FDCPA claim is different, however, from those raised by the plaintiffs in *Smith* and *Fox*. Unlike those plaintiffs, Mr. Mines's claim alleges that the Defendants violated Section 1692g(a)(2) of the FDCPA by failing to identify the name of the current creditor to whom Mr. Mines's debt was owed. [Dkt. 1 at 4]. Here, Mr. Mines is acknowledging that he "fell behind on paying his bills, including a debt he allegedly owed for a 'Mid-America – Milestone Mastercard account' and that the account went into default." [Dkt. 1 at 3]. Mr. Mines goes on to argue that "after [his] debt went into default, Defendants sent Mr. Mines an initial form collection letter" that "failed to identify effectively the name of the creditor to whom the debt was then owed." [*Id.*] Unlike the plaintiff's Section 1692g(a)(3) FDCPA

---

[7] In *Fox*, the plaintiff brought a claim against a debt collector alleging that it violated the FDCPA when it called her and failed to identify the company calling and disclose that the calls were being made to collect a debt. *Fox*, WL 3420172 at *1. The debt collector then sought to compel arbitration of the plaintiff's claims through equitable estoppel. *Id.* at *4. Ultimately, the Illinois district court denied the debt collector's attempt to compel arbitration. *Id.* at *7. In doing so, the court observed that the "[p]laintiff's claims are not even of a type that could be asserted in defense against a creditor suing on a breach of the cardholder agreement" because the FDCPA distinguished between debt collectors and creditors. *Id.* at *6. That reasoning was the foundation for this Court's ruling in *Smith*.

claim in *Smith*, Mr. Mines's FDCPA claim pursuant to Section 1692g(a)(2) seems to rely on the terms of the Cardholder Agreement.

Defendants assert that *Tickanen v. Harris & Harris, Ltd.*, 461 F. Supp. 2d 863, (E.D. Wis. 2006), is more analogous to the facts of this case. In *Tickanen*, three plaintiffs opened Boston Store credit card accounts with National Bank of Great Lakes ("NBGL"). *Id.* at 865–66. NBGL then sold the plaintiffs' accounts to HSBC Bank, which ultimately closed the accounts and assigned the debts to Harris & Harris ("Harris"), a debt-collection agency. *Id.* at 866. Harris then attempted to collect the debt of one plaintiff by sending her a letter, but the letter allegedly incorrectly identified the plaintiff's creditor. *Id.* at 865, 870. Like Mr. Mines, the plaintiff in *Tickanen* alleged that the collection letter she received violated Section 1692g(a)(2) of the FDCPA because the letter identified the wrong creditor. *Id.* at 870. Ultimately, the Wisconsin district court concluded that in order for the plaintiff in *Tickanen* to prove her claim, she had to "rely on her cardholder agreement to identify the proper creditor." *Id.* at 870. For that reason, the court found that the plaintiff "presume[d] the existence of" her cardholder agreement such that she could not equitably ignore the portion of that agreement requiring her to arbitrate her claim. *Id.* at 870.

The Undersigned agrees with the Defendants that the facts of this case are distinguishable from those in *Smith* and more akin to the facts of *Tickanen*. In *Smith,* the plaintiff brought her FDCPA claim pursuant to Section 1692g(a)(3), which concerns challenges to the validity of a debt. Like the plaintiff in *Tickanen*,

Mr. Mines's FDCPA claim is brought pursuant to Section 1692g(a)(2) and concerns misrepresentations as to the identity of a debtor's creditor. Thus, like the plaintiff in *Tickanen*, in order to prevail on his FDCPA claim Mr. Mines must rely on the Cardholder Agreement to identify the proper creditor of his debt. *See also Fox*, 2010 WL 3420172 at * 6 (distinguishing *Tickanen* from other FDCPA claims because "the claim[s] in *Tickanen* [were] based on the defendant's alleged misrepresentation as to the plaintiff's creditor. Thus, . . . the plaintiff had to rely on her cardholder agreement to identify the proper creditor.").

Because of this reliance on the agreement, the Magistrate Judge finds that, under the doctrine of equitable estoppel, Defendant Global, a non-signatory to the agreement, has a right to rely on the arbitration provision contained in the Cardholder Agreement.

For the sake of completeness, the Undersigned will also address Defendants' next argument that Defendant Global may compel arbitration under the second application of the doctrine of equitable estoppel which provides:

> application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.

*German Am. Fin. Advisors & Trust Co. v. Reed*, 969 N.E.2d at 628. Essentially, Defendants maintain that because Mr. Mines ascribed joint liability to Defendant Global and Defendant Galaxy, equitable estoppel permits Defendant Global, a non-signatory to the agreement, to compel arbitration. [Dkt. 27 at 14.] Specifically,

Defendants argue that Mr. Mines's complaint alleges that Defendant Galaxy and Defendant Global jointly sent Mr. Mines the collection letter that violated the FDCPA. [Dkt. 27 at 14].  Directing the Court to Mr. Mines's complaint, the Defendants argue that Mr. Mines raises allegations of substantially interdependent and concerted misconduct by both Defendants, thus triggering the second application of the equitable estoppel doctrine.

Defendants rely on *Tickanen* to support their joint conduct legal theory for equitable estoppel. The Court finds the Defendants' reliance on this case misplaced. As discussed earlier, *Tickanen* involves only one defendant. Thus, the Wisconsin court never addressed the second application of equitable estoppel to joint conduct. Defendants fail to provide any additional legal support to establish that equitable estoppel would apply in this instance. "The Court may not develop arguments for litigants, and underdeveloped arguments are waived." *Baldwin*, 2017 WL 3894957 at * 6 (citing *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005)). Moreover, in the reply brief, the Defendants admit that "Mr. Mines alleges that nearly eight months before he filed for bankruptcy, Defendant Global sent him a collection letter that allegedly violated the FDCPA." [Dkt. 42 at 6]. The Court is not clear whether the Defendants have abandoned this argument. Nevertheless, the Undersigned finds that Defendants have not established their argument showing that the second application of equitable estoppel would apply to Defendant Global.

24

B. **<u>The Plaintiff Has Failed to Demonstrate that the FDCPA Precludes Arbitration of His Claims.</u>**

Here, the Plaintiff contends that even if the Court finds an enforceable agreement to arbitrate existed between the parties, the Court is unable to compel arbitration because the FDCPA precludes arbitration of his claim.

When parties enter into a valid arbitration agreement, grievances between them are presumed to be arbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT & T Techs.*, 475 U.S. at 650.

The Supreme Court has recognized that federal statutory claims can be appropriately resolved through arbitration. *See Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 89 (2000). In determining whether statutory claims may be arbitrated, the Court must ask "whether the parties agreed to submit their claims to arbitration and then ask whether Congress has evinced an intention to preclude waiver of judicial remedies for the statutory rights at issue." *Id.*

Here, the Cardholder Agreement's arbitration provision provides that the parties will arbitrate "any dispute or claim between you . . . and us…if the dispute claim *arises out of or is related to*:...this Agreement or…your Account… or any relationship resulting from this Agreement… or any other agreement related to your Account…or any breach of this Agreement or any such agreement, whether

based on *statute*, contract, tort or any other legal theory. [Dkt. 29 at 100.] (emphasis added). [Dkt. 29 at 100.]

The language here is both broad and capable of expansive reach, creating a "presumption of arbitrability." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1034 (7th Cir. 2012) (quoting *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999)). *See also Clemins v. GE Money Bank*, No. 11–CV–00210, 2012 WL 5868659 at * 3 (E.D. Wis. Nov. 20, 2012) (applying *Gore* to a credit card agreement).

Mr. Mines relies on *Harrier v. Verizon Wireless Personal Commc'ns LP*, 903 F.3d 1281 (M.D. Fla. 2012), to show that FDCPA claims generally do not arise out of a credit card agreement. This case is unpersuasive and easily distinguishable from the facts of this case. In *Harrier,* the plaintiff's claims were based on alleged violations of the Telephone Consumer Protection Act that occurred after he received a Chapter Seven bankruptcy discharge. In that case, the court found that the plaintiff's claims were not based on the credit card agreement, nor was he attempting to take advantage of the agreement. There was no holding by the Florida court finding that FDCPA claims are not arbitrable. As noted earlier, the Undersigned finds that Mr. Mines's FDCPA claim—failure of the Defendants to clearly identify the name of the current creditor to whom the Plaintiff owed a debt— relates to his Account, which is governed by the Cardholder Agreement.  Thus, the Undersigned finds that Mr. Mines's claim arises out of and is related to the Cardholder Agreement.

26

Mr. Mines can still defeat the strong presumption of arbitration, if he can demonstrate that Congress intended to preclude the arbitration of FDCPA claims. *See Green Tree*, 531 U.S. at 91–92. Mr. Mines's briefing, however, contains no argument addressing this second prong. Therefore, Mr. Mines has failed to carry his burden on this issue. *See Green Tree*, 531 U.S. at 91–92.

Given the extremely strong presumption of arbitrability and the clear language of the arbitration provision, the Undersigned finds that the parties agreed to arbitrate this dispute. The Plaintiff has failed to rebut the presumption toward arbitration or demonstrate that the language in the agreement excludes FDCPA claims.

C. **The Right of the Defendants to Arbitrate this Dispute was not Discharged in Mr. Mines's Bankruptcy Proceedings.**

Plaintiff contends that any right to arbitration was terminated when he received the bankruptcy discharge because he rejected all arbitration provisions in all executory contracts in his amended schedule G and as a matter of course.

The bankruptcy code does not define an executory contract, but the Seventh Circuit has defined it as a "contract[] where significant unperformed obligations remain on both sides." *In re Streets & Bard Farm P'ship*, 882 F.2d 233, 235 (7th Cir. 1989) (citing V. Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn.L.Rev. 439, 460 (1974)). "In other words, a contract is executory if each party is burdened with obligations which if not performed would amount to a material

breach." *Dick ex rel. Amended Hilbert Residence Maint. Trust v. Conseco, Inc.*, 458 F.3d 573, 578 (7th Cir. 2006).

To determine whether the remaining obligations under a contract would amount to a material breach, if left unperformed, the Court looks to relevant state law. *In re Streets & Bard Farm P'ship*, 882 F.2d at 235. Neither party addresses whether Indiana or Missouri law applies, and their briefing cites cases from multiple states. Regardless, both Indiana and Missouri have adopted the view of the Restatement (Second) of Contracts to determine whether a failure constitutes a material breach. *Frazier v. Mellowitz*, 804 N.E.2d 796, 803–04 (Ind. Ct. App. 2004); *L.L. Lewis Const., LLC. v. Adrian*, 142 S.W.3d 255, 260 (Mo. Ct. App. 2004). The Restatement lays out five factors for the court's consideration: "(1) the amount of the benefit lost to the injured party; (2) the adequacy of compensation to the injured party; (3) the amount of forfeiture by the breaching party; (4) the likelihood that the breaching party will cure; and (5) the breaching party's good faith." *Adrian*, 142 S.W.3d at 260; *see Frazier* 804 N.E.2d 796, 803; Restatement (Second) of Contracts § 241 (1981).

Pursuant to the agreement between Mid-America and Mr. Mines, Mid-America was obligated to extend $300 of credit to Mr. Mines[8], and Mr. Mines was obligated to repay the debt with interest. [Dkt. 29 at 57–61.] Therefore, in order for the contract to be deemed executory, both Mid-America's obligation to extend credit

---

[8] Mr. Mines's credit limit was $300. Pursuant to the Terms and Conditions, his Account also had an annual fee of $75. Therefore, until Mr. Mines paid this annual fee he only had $225 of credit available to him.

to Mr. Mines and Mr. Mines's obligation to repay Mid-America must be significantly unperformed.

Mid-America extended Mr. Mines the maximum amount of credit allowed under their agreement. [Dkt. 29 at 102–118.] Until Mr. Mines repaid some of his debt, Mid-America had no further obligations to Mr. Mines, and once the Account was closed Mid-America had no further obligations to extend any credit to the Account. [Dkt. 29 at 55–65.]

Mr. Mines asserts that his credit card account was an "open contract" where the parties' obligations varied based on the usage of the card. However, because Mr. Mines maxed out the Account on the first use and never repaid any of the debt, Mid-America never had an obligation to extend him more credit. Although Mr. Mines's debt obligation may have still fluctuated because of late fees, *see Smither*, 919 N.E. 2d 1159, Mid-America's obligation to extend credit to Mr. Mines was completely performed on May 23, 2015, the date when Mid-America extended him the full amount of credit under the parties' agreement. Moreover, once Mid-America closed the Account, any future possibility of owing credit to Mr. Mines was eliminated.

Because Mid-America fully performed under its agreement with Mr. Mines, it could not be deemed in material breach at the time of Mr. Mines's bankruptcy proceedings. Therefore, the Undersigned finds that Mid-America and Mr. Mines's contract was not an executory contract, and the rights of the Defendants to arbitrate this dispute were not discharged in Mr. Mines's bankruptcy proceedings.

Mr. Mines also argues that any right to arbitration was discharged through his bankruptcy as a matter of course. In order to decline arbitration on this ground, the Court must find that arbitration of a plaintiff's claim would frustrate or conflict with the purposes of the Bankruptcy Code. *In re Roth*, 594 B.R. 672, 676 (S.D. Ind. 2018).

Plaintiff cites several cases for the proposition that arbitration of FDCPA claims conflict with the Bankruptcy Code. Here, Mr. Mines alleges a violation of the FDCPA *before* he filed his petition for bankruptcy. However, as Defendants point out, all of the cases Mr. Mines cites concern situations where a creditor attempted to collect on a debt during or after the bankruptcy proceedings. As noted earlier, underdeveloped arguments are considered waived. *Baldwin*, 2017 WL 3894957 at * 6.

The Undersigned is not aware of and the parties have not directed the Court to any cases where a court considered the arbitrability of alleged pre-petition violations of the FDCPA in post-bankruptcy proceedings. Therefore, the Court finds that Mr. Mines has not established his argument that compelling arbitration in his case would frustrate or conflict with the purposes of the Bankruptcy Code.

## V.    Conclusion

The Undersigned recommends that Defendants' Motion to Compel Arbitration and Stay the Case be **GRANTED**. Defendant Galaxy has standing under the Cardholder Agreement to compel arbitration. Defendant Global may compel arbitration under the doctrine of equitable estoppel.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. §636(b)(1). Failure to timely file objections within fourteen days after service shall constitute waiver of subsequent review absent a showing of good cause for such failure.

Date: 3/6/2019

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-Registered counsel of record via email.